1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

TRAVIS A. AVILA,

Civil No.    07-cv-1604-JLS (POR)

11

Plaintiff,

12

**REPORT AND RECOMMENDATION THAT**

13

v.

**(1) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BE DENIED;**

14
15

DAVE KHATRI,

**(2) DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT BE GRANTED; AND**

16
17

Defendant.

**(3) THE CASE BE DISMISSED WITH PREJUDICE**

18
19

**(Doc. Nos. 43 & 111.)**

20
21
22
23
24

    Plaintiff is a former state prisoner proceeding in this action *pro se*.  While incarcerated at Centinela State Prison ("Centinela"), Plaintiff alleges in his First Amended Complaint ("FAC"), brought under 42 U.S.C. § 1983, that Defendant Dave Khatri, M.D., violated Plaintiff's Eighth Amendment rights by improperly treating Plaintiff's injured knee and hepatitis C infection.  Plaintiff seeks declaratory relief, as well as nominal, compensatory, and punitive damages.

25
26
27
28

    Before the Court is Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment.  For the reasons set forth below, the undersigned magistrate judge respectfully recommends that the Court **DENY** Plaintiff's motion for summary judgment, **GRANT** Defendant's cross-motion for summary judgment, and **DISMISS** this action with prejudice.

## I.   PROCEDURAL BACKGROUND

On August 13, 2007, Plaintiff filed a complaint against Defendant Dave Khatri, a physician employed by Centinela, and Defendant George Giurbino, warden of Centinela, alleging violations of the Eighth Amendment right to be free from excessively harsh treatment.  (Doc. No. 1.)  Specifically, Plaintiff brought two claims: (a) deliberate indifference to safety and (b) deliberate indifference to medical needs.

On January 25, 2008, Defendants Khatri and Giurbino filed a motion to dismiss in which Defendant Giurbino argued that Plaintiff's claim of deliberate indifference to safety cannot be brought against him because Plaintiff failed to exhaust his available administrative remedies as required by the Prison Litigation Reform Act.  (Doc. No. 10.)  Defendants further argued that Plaintiff's complaint did not allege facts sufficient to support his second claim for deliberate indifference to medical needs.  (Id.)

On August 28, 2008, this Court granted in part and denied in part the motion to dismiss. (Doc. No. 23.)  The Court granted the motion to dismiss as to Plaintiff's deliberate indifference to safety claim because of Plaintiff's failure to exhaust, as well as Plaintiff's claims against Defendant Giurbino.  The Court also denied the motion to dismiss with respect to Plaintiff's deliberate indifference to medical needs claim as to Defendant Khatri.  (Id.)

On September 3, 2008, Defendant Khatri (hereinafter, "Defendant") filed an Answer.  (Doc. No. 24.)

On October 15, 2008, Plaintiff filed a First Amended Complaint ("FAC") and a motion for summary judgment.  (Doc. No. 43, 47.)  In its March 16, 2009 Order, in light of confusion expressed by Defendant, the Court deemed the motion for summary judgment was applicable to the FAC. (Doc. No. 82 at 3.)  Plaintiff brings suit alleging Defendant improperly treated his hepatitis C virus and injured knee, and he seeks summary judgment on the grounds of insufficient medical care in violation of his Eighth Amendment rights.

On December 10, 2008, Defendant filed an Answer to the FAC.  (Doc. No. 59.)

On April 24, 2009, Defendant filed an Opposition to Plaintiff's motion for summary judgment.  (Doc. No. 110.)  Defendant asserts he provided Plaintiff with the appropriate medical

1    care in light of Plaintiff's health status and prison medical protocols.

2        On April 28, 2009, Plaintiff filed a Reply to Defendant's Opposition to Plaintiff's motion for

3    summary judgment.  (Doc. No. 127.)

4        On May 11, 2009, Defendant filed a cross-motion for summary judgment.  (Doc. No. 111.)

5    Defendant asserts he is entitled to summary judgment as a matter of law because the evidence shows

6    he was not deliberately indifferent to Plaintiff's medical needs..

7        On June 30, 2009, Plaintiff filed an Opposition to Defendant's cross-motion for summary

8    judgment.  (Doc. No. 124.)

9

## II.   FACTUAL BACKGROUND

10    **A.   Hepatitis C Virus**

11        Defendant is a medical doctor who has worked for the California Department of Corrections

12    and Rehabilitation ("CDCR") for seven years.  (Khatri Decl. at ¶ 2.)  He was in charge of the

13    Hepatitis C Treatment Clinic Management Program at Centinela State Prison from September 2006

14    through February 2009.  (Id.)  As the director of the program, Defendant followed CDCR medical

15    protocols, known as "Hepatitis C Clinical Management Program," for treating inmates who have

16    been diagnosed with the hepatitis C virus.  (Id. ¶ 3; see also Doc. 43-3 at 131, 139-40.)  There are

17    three phases to the Hepatitis C Clinical Management Program:

18       (a) Phase I: Screening and Initial Diagnosis. Protocols for Phase I include screening the inmate to determine if he has the Hepatitis C virus.  This screening

19    process includes the taking of blood tests to assist in making a diagnosis.  This phase is anticipated to last three months, but can last longer depending on the inmate's

20    health status.

      (b) Phase II: Initial Management After Diagnosis of HCV ["Hepatitis C

21    Virus"]. During this phase, the inmate is evaluated to determine the effectiveness of the proposed Hepatitis C treatment.  Because inmates are medically screened for

22    contraindications to the treatment protocols, which, if existed, would exclude the inmate from treatment, not every inmate who is screened will qualify for the Hepatitis

23    C treatment.

      (c) Phase III: Staging by Liver Biopsy and Combination Therapy. This phase

24    establishes a protocol for taking a liver biopsy, and for instituting combination therapy of interferon and Ribavirin, for those inmates that can tolerate a combination

25    therapy. Depending on the HCV genotype, the combination therapy can last from six months to a year.

26

27

28

1   (Khatri Decl. at ¶ 4.[1])

2        The protocols exclude inmates from the hepatitis C treatment for various reasons, including

3   certain medical conditions.  (Khatri Decl. at ¶ 5.)  An inmate, for example, who is 45 years old or

4   younger with alanine aminotransferace ("ALT") levels elevated to less than two times normal

5   laboratory values on three consecutive tests, at least one month apart, is not eligible for treatment.

6   (Id.)  Additionally, inmates with a decompensated cirrhosis are not eligible for treatment, and

7   inmates with poorly controlled cardiopulmonary, cerebrovasculor or thyroid disease, seizures,

8   cancer or renal insufficiency are not eligible.  (Id.)

9                          **i.       Plaintiff's Treatment for Hepatitis C**

10       Plaintiff entered the California Department of Corrections in March 2006, whereupon he was

11  diagnosed with hepatitis C.  (FAC at 2.)  In May 2006, Plaintiff became an inmate at Centinela State

12  Prison.  (Id.)

13       On October 27, 2006, Defendant first examined Plaintiff for his hepatitis C.[2]  (Doc. 43-2 at

14  56; Khatri Decl. at ¶ 3.)  Following this examination, Defendant completed an Outpatient

15  Interdisciplinary Progress Note.  (Doc. No. 43-5 at 93.)  The Defendant discussed Plaintiff's medical

16  and drug history and the results of various laboratory tests, and then stated that "at the present time,

17  because of [Plaintiff's] low platelets, liver biopsy as well as Interferon and Ribavirin therapy is not

18  indicated.  The patient understands this fairly well and agrees with our plan."  (Id.)

19       Thereafter, Plaintiff was scheduled for follow-up appointments every thirty to sixty days.

20  Plaintiff states he saw Defendant more frequently, "once a month at least, sometimes twice a

21  month."  (Doc. No. 110 at 31.)  As an inmate treated at the Hepatitis C Treatment Clinic, Plaintiff

22  was scheduled for or seen by Centinela medical staff, and/or scheduled for laboratory tests, on an

23

24

25

26       [1]In his exhibits in support of his motion for summary judgment, Plaintiff includes a March 2004 version of the
    Hepatitis C Clinical Management Program Manual.  (Doc. 43-4 at 1-18.)
27

28       [2]There is a discrepancy as to when in October 2006 Defendant first saw Plaintiff.  Although Defendant states in his
    affidavit in support of his cross-motion for summary judgment that he first saw Plaintiff on October 27, 2006, Defendant's
    medical notes have a date of October 19, 2006.  (Compare Khatri Decl. at ¶ 3 with Doc. 43-5 at 93.)

07cv1604

1    almost-monthly basis.[3]

2           On April 26, 2007, Dr. Mostafa Hamdy of the Valley Endoscopy Center performed a

3    Esophagogastroduodenoscopy procedure on Plaintiff.  (Doc. 43-3 at 102.)  Based upon the results of

4    this procedure, it was recommended that Plaintiff be monitored routinely for liver cancer.  (Id.)  Dr.

5    Hamdy also recommended the following: "Hepatitis C TX with pegasys and ribavirin need to be

6    discussed with patient with education re high failure rate and adverse effects in patients with

7    cirrhosis."  (Id.)

8           On June 6, 2007, Plaintiff signed a Hepatitis C Biopsy and Treatment Contract required for

9    participation in the Hepatitis C Clinical Management Program, in which he initialed the following:

10          "I understand that a medical hold will be placed on me until the liver
        biopsy is performed and the biopsy results are discussed with me.
11          "I understand that the therapy may be of no benefit to me and that it may
        not eradicate my hepatitis C infection.
12          "I understand that the course of therapy may continue for 12-months and
        that periodic blood testing will be a necessary part of the hepatitis C treatment
13        program.
            "I understand that my failure to comply with the therapy or its monitoring
14      may result in discontinuation of therapy.
            "I understand that I may be required to undergo random blood or urine
15      testing for substance abuse and that any positive test will result in discontinuation
        of, or loss of eligibility for, treatment.
16          "I understand that completion of this contract does not guarantee that I
        will be endorsed for hepatitis C treatment."

17  (Doc. 43-3 at 109.)

18  _____

19        [3]Plaintiff's medical information is obtained from exhibits submitted by Plaintiff in support of his motion for
    summary judgment.  It is doubtful whether these reflect Plaintiff's complete medical records from the Centinela State Prison
20  and the outsourced medical facilities, as there are substantial periods of time that are unaccounted.

        Nonetheless, from the medical records provided by Plaintiff, Defendant scheduled Plaintiff for "14-day post follow-
21  up visit[s]" on June 22, 2006 (Doc. No. 43-2 at 65); August 7, 2006 (Doc. No. 43-2 at 66); December 11, 2006 (Doc. 43-2
    at 61); January 9, 2007 (Doc. No. 43-2 at 60); March 26, 2007 (Doc. 43-5 at 94); May 15, 2007 (Doc. 43-5 at 82); June 13,
22  2007 (Doc. No. 43-2 at 64); July 24, 2007 (Doc. No. 43-2 at 63); January 31, 2008 (Doc. 43-2 at 59); and December 4, 2008
    (Doc. No. 43-2 at 62).

23        Plaintiff was seen at the Centinela medical clinic on July 24, 2006 with a 30-day follow-up visit (Doc. 43-2 at 42-
    44); November 16, 2006 (Doc. 43-2 at 87); December 7, 2006 with a 60-day follow-up visit (Doc. No. 43-2 at 84); February
24  6, 2007 (Doc. 43-2 at 49); February 14, 2007 (Doc. No. 43-2 at 49); April 26, 2007 (Doc. 43-3 at 98); March 19,
    2007 (Doc. 43-2 at 48); June 26, 2007 (Doc. 43-2 at 47); September 5, 2007 (Doc. 43-2 at 46); October 29, 2007
25  (Doc. 43-3 at 99); January 3, 2008 (Doc. 43-5 at 65); April 14, 2008 (Doc. 43-3 at 86); April 17, 2008 (Doc. 43-3 at 88); May
    23, 2008 (Doc. 43-5 at 97); and June 20, 2008 (Doc. 43-5 at 98).

26        Plaintiff had laboratory work (including urine and blood tests) done on June 16, 2006 (Doc. 43-2 at 41); November
    24, 2006 (Doc. 43-2 at 53); December 5, 2006 (Doc. 43-2 at 78-79); February 21, 2007 (Doc. 43-2 at 76-77); March 26,
27  2007 (Doc. 43-2 at 75); May 1, 2007 (Doc. 43-2 at 82-83); May 9, 2007 (Doc. No. 43-2 at 81); May 11, 2007 (Doc. 43-2 at
    74); May 21, 2007 (Doc. 43-2 at 73); August 9, 2007 (Doc. 43-2 at 69-72); and April 17, 2008 (Doc. 43-3 at 90-94).

28        Physician request forms for services were submitted on January 24, 2007 (colonoscopy, endoscopy) (Doc. No. 43-3
    at 106); April 11, 2007 (liver biopsy) (Doc. 43-2 at 58); and May 2, 2008 (mental health clearance) (Doc. 43-3 at 108).

On June 26, 2007, Defendant completed an Outpatient Interdisciplinary Progress Note. (Doc. 43-5 at 92.)  Defendant stated that he discussed with Plaintiff the fact that he might not qualify for hepatitis C treatment in light of his low platelet count.  (Id.)  Per Defendant, "Plaintiff agreed with this."  (Id.)

On April 14, 2008, Plaintiff signed a second Hepatitis C Biopsy and Treatment Contract. (Doc. 43-3 at 85.)

On May 1, 2008, Defendant completed an Outpatient Interdisciplinary Progress Note.  (Doc. No. 43-5 at 90-91.)  There, Defendant noted that he saw Plaintiff on June 26, 2007, but could not start him on treatment for his hepatitis C because Plaintiff had a very low platelet count with a low white cell count.  (Id. at 90.)  Defendant also stated that although Plaintiff had been seen by Dr. Hamdy on July 24, 2007, "because of [Plaintiff's] low platelets and white cell count no treatment with Interferon or Ribavirin was recommended."  Id.  Defendant further noted that Plaintiff was seen on April 14, 2008, and then again on April 18, 2008 by Dr. Abraham Eskenazi, a physician working in the hepatitis C clinic who recommended that Plaintiff be started on a treatment plan for hepatitis C, a recommendation with which Defendant agreed.  (Id.)

Plaintiff began his treatment for his hepatitis C with Interferon and Ribavirin on April 14, 2008.  (See Doc. 43-5 at 107.)

### ii.    Appeal for Compassionate Release

On October 13, 2006, Plaintiff filed a California Department of Corrections ("CDC") 602 Appeal[4] in which he claims he "was not being given the interferon treatments the doctors told me about.  The doctor said I may have liver cancer now since my test results show high counts of virus and abnormally low counts of platelets."  (Doc. 43-2 at 33.)  Plaintiff also acknowledged he was

---

[4]The administrative appeals process for California inmates is set forth in Title 15 of the California Code of Regulations, which provides, "Any inmate . . . may appeal any departmental decision, action, condition, or policy perceived by those individuals as adversely affecting their welfare."  Cal. Code Regs. Tit. 15 § 3084.1(a).  The process consists of four steps.  The first step is for the inmate to attempt to informally resolve his or her problem with the staff member involved. Id. at § 3084.5(a).  If unsuccessful, the inmate can submit an appeal on the CDC inmate appeal form, called a "602" form. Id. at § 3084.5(b).  If denied at that level, the inmate can appeal to the second level of formal review conducted by the institution head or his/her designee.  Id. at § 3084.5(c).  The third and final level of formal review, called the "Director's Level," is conducted by the Director of CDC or his/her designee.  Cal. Dept. Of Corr. Operations Manual § 54100.11; Nichols v. Logan, 355 F. Supp. 2d 1155, 1161 (S.D. Cal. 2004).

informed that he may not be eligible for interferon treatment because he may have liver cancer in light of the high count of the hepatitis C virus and an abnormally low count of platelets.  (Id.)  In this appeal, Plaintiff sought a compassionate release "if [he was] not going to benefit from [the interferon] treatment" because of his cirrhosis, which he claimed was terminal.  (Id.)

On October 20, 2006, prior to receiving a response to his first appeal, Plaintiff filed a second CDC 602 Appeal in which he again sought a compassionate release on the ground that he had been diagnosed with cirrhosis.  (Doc. 43-5 at 122.)  In support, Plaintiff stated that he "underwent six months of testing with results showing clearly cirrhosis of the liver, shrunken liver, enlarged spleen and severe anemia (blood platelet levels so low, I could easily bleed to death if stabbed or cut)." (Id.)

On November 9, 2006, Plaintiff's first appeal for a compassionate release was partially granted at the informal level of review and Plaintiff was informed that any further recommendations as to his treatment for hepatitis C were pending his lab results and the hepatitis C clinic assessment. (Doc. 43-2 at 33.)  Plaintiff's request for a compassionate release was denied based upon the finding that Plaintiff's condition was not terminal.  (Id.)

Also on November 9, 2006, Plaintiff's second appeal for a compassionate release was denied at the informal level of review because "there is no suggestion that [Plaintiff's] condition is terminal."  (Doc. 43-5 at 122.)

On January 10, 2007, Plaintiff received a First Level Appeal Response in which his appeal for a compassionate release was denied when, after consultation with Defendant, it was found that Plaintiff's condition was not terminal.  (Doc. 43-5 at 124.)

On January 30, 2007, Plaintiff received a Second Level Appeal Response in which his appeal was denied again when, after consultation with Defendant, it was found that Plaintiff's condition was not terminal.  (Doc. 43-5 at 125-126.)

On April 26, 2007, Plaintiff received a Director's Level Appeal Decision, which again denied Plaintiff's request for a compassionate release because he did not meet state law requirements for such a release.  (Doc. 43-5 at 121.)

### iii.    Appeal for Inadequate Medical Care

- 7 -

On March 4, 2007, Plaintiff filed a CDC 602 Appeal in which he claims that his "hepatitis C is not being dealt with properly . . . .  Dr. Khatri is not helping me at all."  (Doc. 43-2 at 26.)

On March 21, 2007, the Centinela State Prison responded informally to Plaintiff's appeal for inadequate medical care by informing him that he was seen on December 12, 2006[5] and had a follow-up pending.  (Doc. 43-2 at 36.)  This informal response also reminded Plaintiff that, on January 24, 2007, he was referred for routine gastric diagnostic tests, which were scheduled for the end of March 2007.  (Id.)

On May 2, 2007, Plaintiff received a First Appeal Response in which it was noted that although Plaintiff had been diagnosed with hepatitis C, it was "not at a level requiring treatment at this time."  (Doc. 43-2 at 37.)  The Response further noted that Plaintiff "will receive a follow-up in the Hep C Chronic Care Clinic and the attending clinician will continue addressing [Plaintiff's] concerns regarding the disease, but CDCR licensed staff will determine the appropriate treatment plan according to their medical assessment and our treatment protocol guidelines; inmates may not dictate their treatment plan."  (Id.)

On May 15, 2007, Plaintiff submitted a written letter in support of his appeal for inadequate medical care in which he stated that he does "not agree with the decision by Dave Kahtri [sic], Chief Medical Doctor because the specialist from the private sector does not agree with his diagnosis. In fact, the specialist told me personally that he was recommending me for the pegasus treatments (for hepatitis C). . . . I signed a waiver for interferon but not for the pegasus the specialist is recommending.  I insist that this medical issue be addressed professionally as though I were a patient in the private sector, for were I at this time such, I would already be taking the treatments.  My rights are being violated daily by medical negligence. . . ."  (Doc. 43-2 at 25.)

On June 11, 2007, Plaintiff received the following Second Appeal Response:

> According to the attached 4/26/07 note from the outside contracted gastroenterology specialist, Dr. Hamdy, recommended a CDCR licensed clinician to discuss/educate you further regarding treatment issues.  You are scheduled to be seen in the Chronic Care Clinic for Hepatitis C patients and the attending clinician can address your concerns.  Again you are informed that you may not dictate your own treatment plan. You will receive treatment as per our written medical services protocol that is applied

---

[5]The Appeal Response, dated March 21, 2007, states Plaintiff was seen on "12/7/07," but this is clearly a mistake as Plaintiff could not have been seen almost nine months after the date of this response.

1  without discrimination to every inmate at this institution.

2  (Doc. 43-5 at 119.)

3  On June 21, 2007, Plaintiff appealed this decision, stating that he wants the interferon

4  treatment and that Defendant was "doing nothing."  (Doc. 43-5 at 116.)

5  On October 5, 2007, Plaintiff received a Director's Level Appeal Decision, in which his

6  appeal was denied.  (Doc. 43-5 at 113-14.)  The decision stated that "[t]here is no evidence that

7  supports [Plaintiff's] contention that medical staff have failed to provide him adequate treatment. . . .

8  Despite [Plaintiff's] dissatisfaction with the [Second Level Review] decision, it is evident that

9  medical staff are providing [Plaintiff] continued medical treatment and taking appropriate actions."

10  (Id. at 113.)

11  **B.     Knee Injury**

12  In August 2006, Plaintiff claims his right knee was injured during a riot at Centinela.  (FAC

13  at 2.)  On February 14, 2007, Defendant began treating Plaintiff for his knee.  (See Khatri Decl. at

14  ¶ 9; Doc. 43-2 at 57.)  On March 20, 2007, Plaintiff received a knee brace.  (Doc. 43-2 at 37.)

15  Plaintiff was thereafter seen by clinicians on April 11, 2007 and April 16, 2007; during both visits

16  Plaintiff stated he felt fine and, thus, no pain medication was prescribed.  (Doc. 43-2 at 37.)  In May

17  2007, Plaintiff had an MRI taken.  (See Doc. 43-2 at 31.)  The results of the MRI indicated that there

18  was a "horizontal tear of the posterior horn of the lateral meniscus."  (Doc. 43-3 at 97.)

19  On September 15, 2007, Plaintiff filed a CDC 602 Appeal regarding his knee, in which he

20  claimed that x-rays were taken and an MRI was given, but "[s]till nothing has been done except a

21  knee brace."  (Doc. 43-2 at 31.)  An informal response was provided on October 4, 2007 wherein the

22  Centinela Health Care Appeals Coordinator noted that Plaintiff was scheduled for a follow-up with

23  his primary care provider to review and discuss treatment options.  (Id.)

24  On December 7, 2007, Plaintiff was examined by Dr. Christopher Lai, a doctor with the

25  Pioneers Memorial Healthcare District.  (Doc. 67-3 at 4.)  Dr. Lai noted that Plaintiff "is tender

26  along the lateral joint line of the knee and the medial joint line. . . . The knee is stable to varus,

27  valgus, anterior and posterior stress.  Sensation and strength are intact."  (Id.)  Dr. Lai then discussed

28  treatment options with Plaintiff, and noted that Plaintiff "will need preoperative clearance [for a

knee surgery] from his Centinela physician because of his [low platelet count]." (Id.)  According to

Plaintiff, Dr. Lai informed him "that there may be a need for 'platelets' to be infused during surgery

to help clotting of blood factors."  (FAC at 4.)

While treating Plaintiff for hepatitis C, Defendant conducted monthly blood tests and asserts

that "during the time [he] evaluated [Plaintiff] for [treatment for hepatitis C], [Plaintiff's] laboratory

tests showed a very low platelet count and white cell count . . . ."  (See Khatri Decl. at ¶¶ 6, 9.)

Based upon the results of those tests, Defendant asserts he did not approve Plaintiff for knee surgery

because Plaintiff "would have bled excessively, possibly risking death."  (Khatri Decl. at ¶ 9.)

Plaintiff admits in his FAC that "Defendant warned the Plaintiff that he would 'bleed to death' if he

was to take the surgery."  (FAC at 4.)

Plaintiff was eventually approved for surgery in either January or February 2009.  (See Doc.

110-3 at 13.)

**C.     Plaintiff's 42 U.S.C. § 1983 Action**

On October 15, 2008, Plaintiff filed his FAC.  (Doc. No. 47.)  Plaintiff brings suit against

Defendant for improperly treating Plaintiff's hepatitis C virus and injured knee.  As to his hepatitis C

virus, Plaintiff alleges Defendant forced him "to undergo and to do unreasonable things to merit his

promise of impending treatment.  To wit, Plaintiff was forced to undergo drug screening for six

months, and to tolerate unending diagnostic testing . . . ."  (FAC at ¶ 14.)  Plaintiff alleges Defendant

substituted his judgment for that of an infectious disease specialist (Dr. Eskenazi) and that

Defendant's "clearly grossly inadequate response" to his medical needs would "shock the

conscience."  (Id. at ¶ 15.)  As to his injured knee, Plaintiff alleges Defendant's delay in approving

Dr. Lai's recommendation surgery for his knee was based on Defendant's "dishonesty" and

"deception."  (Id. at ¶ 30.)  Plaintiff alleges Defendant's decisions regarding delaying approval for

treatment of his hepatitis C and surgery for his injured knee were based upon "reasons of costs" or

were improperly made by Defendant, a non-specialist.  (Id. at ¶ 31.)

In support of his motion for summary judgment, Plaintiff submits his medical records; a

record of his two appeals (one for compassionate release and the other for improper medical care);

numerous articles on medical care in prisons (see e.g., Doc. 67-4 at 50-62); information on hepatitis

1    C (Doc. 43-2 at 88-94; Doc. 43-3 at 1-82); the CDCR's Inmate-Patient Orientation Handbook to

2    Healthcare Services (Doc. 43-3 at 131-149; Doc. 43-4 at 42-118; Doc. 43-5 at 1-63); and the

3    CDCR's March 2004 Hepatitis C Clinical Management Program Manual (Doc. 43-4 at 1-41).

4          Plaintiff also submits a letter by Dr. Eskenazi.  (Doc. 77-3 at 1.)  In the letter, Dr. Eskenazi

5    stated that Plaintiff was "an excellent candidate for treatment" for hepatitis C, which he started

6    Plaintiff on "immediately."  (Id.)  Dr. Eskenazi also states that he resigned from his position after

7    only five weeks because his attempts to improve the hepatitis C clinic were thwarted by "the

8    medical director there at the time, Dr. Barreras, . . . [who] cancelled my orders and cancelled the

9    follow-up hepatitis C clinic."  (Id.)

10         On April 3, 2009, Plaintiff was deposed by defense counsel.  (See Doc. 110-3 at 4.)  At the

11   deposition, Plaintiff was questioned as to his hepatitis C and knee injury.  Plaintiff asserted that

12   Defendant was his primary care physician because Defendant, as the hepatitis C chronic care clinic

13   doctor, saw Plaintiff "once a month, sometimes twice a month."  (Id. at 13.)

14         Plaintiff was first asked questions regarding his knee injury.  When defense counsel inquired

15   whether Plaintiff had any conversations with Defendant about knee surgery, Plaintiff responded that

16   he had "[s]everal" conversations due to the frequency with which he saw Defendant.  (Id. at 13.)

17   Plaintiff was asked why he believed there was a delay in Dr. Lai's recommendation for surgery and

18   the actual date of surgery.  (See id. at 13.)

19        A.         As far as I understand, the delays were – to me they seemed to be
                     deliberate and on purpose, because after complaining so many times, there's
20                   no way I can understand I have to wait two years and five months, you know,
                     personally.
21                   So as far as any reasons [Defendant] might have, I couldn't say.
          Q.         Well, didn't you just tell me that you've had several conversations with
22                   [Defendant] regarding your knee because you were being seen by him at the
                     hep C clinic?
23        A.         Yes.
          Q.         And I think you talk about this in your complaint a little bit.  Isn't it the
24                   case that [Defendant] was concerned about your low platelet count, should you
                     have the surgery, because he was concerned that you might bleed to death?
25        A.         Yes, he did say that.
          Q.         So that was his reason as to why he was recommending that you not
26                   have the surgery at that time?
          A.         At that time, that's what he told me, yes.
27        Q.         Is it your understanding that that's the only reason as to why
                     [Defendant] believed you should not have the surgery at that time?
28        A.         Just that particular time, or – which time throughout the two years? I
                     mean, each time he had a different excuse, one time was no MRI, one time was

1        no – the platelet count wasn't right.  One time my platelets – half the time –
they go up and down all the time.  So one month my platelets would be

2        perfectly fine, the next month they'll be low, and the next month they'll be
high again.  And so that was what he told me that particular time.

3    Q.       So because you were being seen by him pretty often, and I take it
because you were also going to the hep C clinic, he was then reevaluating you

4        as to whether it was appropriate for you to have surgery; is that fair to say?

    A.       I would assume that that's exactly what he was doing, was evaluating

5        all my medical needs.

6  (Doc. 110-3 at 13-15.)

7    Q.       And the reasons [Defendant] would give you for his recommendation
that you should not have surgery is based on your current health, or a test

8        result?

    A.       Based on his perception of my current health, yes.

9  (Doc. 110-3 at 16.)

10      Plaintiff was then deposed as to his hepatitis C.  Plaintiff testified that he was first seen by

11  Defendant in October 2006 as part of the hepatitis C chronic care clinic.  (Doc. 110-3 at 35.)

12    Q.       As a participant in the hep C clinic, how often were you seen? Was

13        it every 30 days?

    A.       It's every 30 days. . . .

14        . . .

    Q.       All right. What I want you to do – and I know there's been a lot of

15        them – but I want you to tell me, during the time that you've been
participating in the clinic, what type of tests have – has [Defendant] run for

16        you?

    A.       What they consider routine on all the records, they all say routine

17        blood tests, routine – by this routine, I assume – well, I know because there's
other men that have hepatitis C here. What they do is they take and do the

18        same regimen for everybody. . .

19  (Doc. 110-3 at 39-42.)

20      Plaintiff was then asked about conversations he had with Defendant regarding treatment for

21  hepatitis C:

22    Q.       Did you ever have any conversations with [Defendant] about your
wanting to take the Interferon treatment?

23    A.       Several.

    . . .

24    Q.       And he was telling you during those conversations that at that time,
based on your blood tests and your current health status, that you didn't

25        qualify for the Interferon treatment yet, is that right?

    A.       No.  He said that according to the protocol of the California medical

26        guidelines, that I didn't qualify.  So at first, his reasoning was that I had to
take six months of drug tests. And then his reasoning after that was that I had

27        to be – I had some sort of a high level of ALT . . .

        I still don't know what an ALT is to this day.  But eventually, that

28        was his – his excuse was that my blood – he told me about white cells, and
then he told me something about platelets.  So each time –

1   Q.          So you're saying he told you about your white cells and platelets, and
2   so – I'm inferring from you here, but I want to make sure that I understand you. So when you would tell him, "Hey, Dr. Khatri, I'm okay with taking Interferon treatment, I understand the risks" –
3   A.          Yes, I told him that.
    Q.          – he would say, "You don't qualify, and here's why you don't
4   qualify, because your white blood cell count may be off, or your platelet count may be off"? So is that –
5   A.          After a year of taking the blood test and taking the drug screening and
6   doing all that he required of me in the beginning, that became his new excuse, was the platelets at that time.
        ...
7   Q.          . . . You said you were given six months of drug tests. You do mean
    drug testing, not blood testing, right?
8   A.          No.  He said that – let me see if I've got that here.  He made me sign
    an agreement. Have you seen that?
9   Q.          That's the hepatitis C agreement?
    A.          Yes. He told me that I would have to go through six months of
10  screening and they were going to be checking me for drugs. Whether or not he was telling me honestly – I don't know if they check for drugs on the
11  blood or the urine or how they check it, but I assume what he had told me, they were doing.
12  Q.          So whatever it was, there was a protocol where you had to go through
    six months of screening, whether it was a blood test or urinalysis?
13  A.          Yes.
    Q.          And that was to determine whether or not you qualified for the
14  Interferon treatment?
    A.          For endorsement of the treatment.
15  Q.          And you talked about the CDCR's protocol before, so you are aware
    that the California Department of Corrections does have a hepatitis C
16  treatment protocol?
    A.          Yes, I know.
17  Q.          And you've seen those protocols, I believe?
    A.          Yes.
18  Q.          So when [Defendant] was not granting your requests for the
    Interferon treatment, his reasons for that were based on your current health
19  status, you didn't qualify under CDCR's protocols to have the Interferon treatment at that point?
20  A.          Yes.

21  (Doc. 110-3 at 42-45.)

22      Defendant, in his Opposition to Plaintiff's motion for summary judgment, and in his cross-

23  motion for summary judgment, argues that the facts clearly establish that he was not deliberately

24  indifferent to Plaintiff's medical needs.  His decisions were based upon his twenty years of medical

25  expertise, CDCR protocols, and Plaintiff's laboratory tests, and, therefore, seeks summary judgment

26  as a matter of law.

27                          **III.   STANDARD OF REVIEW**

28      Federal Rule of Civil Procedure 56(c) authorizes the granting of summary judgment "if the

                                - 13 -                                    07cv1604

1   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

2   affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

3   party is entitled to judgment as a matter of law."  The standard for granting a motion for summary

4   judgment is essentially the same as for the granting of a directed verdict.  Judgment must be entered

5   "if, under the governing law, there can be but one reasonable conclusion as to the verdict."

6   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).  However, "[i]f reasonable minds

7   could differ," judgment should not be entered in favor of the moving party.  Id.; see also

8   Blankenhorn v. City of Orange, 485 F.3d 463, 470 (9th Cir. 2007) ("If a rational trier of fact might

9   resolve the issue in favor of the nonmoving party, summary judgment must be denied.") (alteration

10   omitted).

11       The parties bear the same substantive burden of proof as would apply at a trial on the merits,

12   including plaintiff's burden to establish any element essential to his case.  Liberty Lobby, 477 U.S.

13   at 252; Celotex v. Catrett, 477 U.S. 317, 322 (1986); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.

14   1989).

15       The moving party bears the initial burden of identifying the elements of the claim in the

16   pleadings, or other evidence, which the moving party "believes demonstrates the absence of a

17   genuine issue of material fact."  Celotex, 477 U.S. at 323; Adickes v. S. H. Kress & Co., 398 U.S.

18   144 (1970); Zoslaw v. MCA Distrib. Corp., 693 F.2d 870, 883 (9th Cir. 1982).  "A material issue of

19   fact is one that affects the outcome of the litigation and requires a trial to resolve the parties'

20   differing versions of the truth."  S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).

21   More than a "metaphysical doubt" is required to establish a genuine issue of material fact.

22   Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

23       The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there

24   is a genuine issue for trial.  Celotex, 477 U.S. at 324.  To successfully rebut a properly supported

25   motion for summary judgment, the nonmoving party "must point to some facts in the record that

26   demonstrate a genuine issue of material fact and, with all reasonable inferences made in the

27   plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]."  Reese v. Jefferson

28   School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000) (citing Fed.R.Civ.P. 56; Celotex, 477 U.S.

at 323; <u>Anderson</u>, 477 U.S. at 249); <u>see also</u> <u>Galen v. County of Los Angeles</u>, 477 F.3d 652, 658 (9th Cir. 2007) (noting that the non-moving party may defeat summary judgment if she makes a showing sufficient to establish a question of material fact requiring a trial to resolve); <u>cf.</u> <u>Paine v. City of Lompoc</u>, 265 F.3d 975, 984 (9th Cir. 2001) ("[I]f a plaintiff cannot in its summary judgment motion factual submissions connect any particular defendant to the incidents giving rise to liability, that defendant is entitled to summary judgment and may not be required to go to trial.").

"To defeat a summary judgment motion ..., the non-moving party 'may not rest upon the mere allegations or denials' in the pleadings. FED.R.CIV.P. 56(e). Instead, the non-moving party "must establish the existence of a genuine factual dispute on the basis of admissible evidence; bare allegations without evidentiary support are insufficient to survive summary judgment." <u>Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.</u>, 2008 WL 341709 at *9 n.14 (9th Cir. Feb. 8, 2008) (Nos. 05-56045, 06-55376). However, even evidence "presented in an inadmissible form" may be considered at the summary judgment stage, if "the contents of the evidence would be admissible at trial." <u>See</u> <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents.").

While the district court is "not required to comb the record to find some reason to deny a motion for summary judgment," <u>Forsberg v. Pacific N.W. Bell Tel. Co.</u>, 840 F.2d 1409, 1417-18 (9th Cir. 1988), <u>Nilsson v. Louisiana Hydrolec</u>, 854 F.2d 1538, 1545 (9th Cir. 1988), the court may nevertheless exercise its discretion "in appropriate circumstances," to consider materials in the record which are on file but not "specifically referred to." <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001). However, the court need not "examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the moving papers with adequate references so that it could be conveniently found." <u>Id.</u>; <u>see also</u> <u>Zoslaw v. MCA Distributing Corp.</u>, 693 F.2d 870, 883 (9th Cir. 1982) ("A party may not prevail in opposing a motion for summary judgment by simply overwhelming the district court with a miscellany of unorganized documentation.").

//

07cv1604

## V.   DISCUSSION

Plaintiff seeks summary judgment as to Defendant's liability based on Defendant's allegedly improper substitution of his opinion for those of medical experts Dr. Eskenazi and Dr. Lai, and his delay in treating Plaintiff's medical needs.  Defendant denies all allegations and seeks summary judgment as a matter of law.

The Eighth Amendment prohibits the imposition of cruel and unusual punishments and "embodies broad and idealistic concepts of dignity, civilized standards, humanity and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (citation and internal quotations omitted); see also Hutto v. Finney, 437 U.S. 678, 685 (1978).  The Supreme Court has established that the government has an Eighth Amendment duty to provide medical care for prisoners.  Estelle, 429 U.S. at 103.  Although not every breach of this duty is a violation of constitutional rights, "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment."  Estelle, 429 U.S. at 104 (quoting Gregg v. Georgia, 426 U.S. 153, 173 (1976)); Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988).

To assert an Eighth Amendment claim for deliberate indifference, a prisoner must satisfy two requirements: one objective and one subjective.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994).  In Farmer, the Supreme Court held that,

> [T]he deprivation alleged must be, objectively, "sufficiently serious[;]" a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." . . . The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment."  To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind."

Id.  That state of mind is shown when Plaintiff can prove "deliberate indifference."  See id. Deliberate indifference is evidenced only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Id. at 837.

In an Eighth Amendment claim for deliberate indifference in the medical context (hereinafter, "deliberate medical indifference"), a plaintiff must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  Estelle, 429 U.S. at 106.  In

Estelle, the Supreme Court held that,

> In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

429 U.S. at 105-06.

In the Ninth Circuit, deliberate medical indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Hutchinson, 838 F.2d at 394. To meet the requirements of a claim for deliberate indifference, a plaintiff must show a purposeful act or failure to respond to pain or possible medical need resulted in harm. McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled in part on other grounds by WMX Techs, Inc. v. Miller, 974 F.2d 1133, 1136 (9th Cir. 1997); Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006) (finding deliberate medical indifference when, for over a year, prison medical personnel knew but failed to respond to a prisoner's need to have a broken thumb examined and treated by a specialist and the delay led to deformity); but see Wood v. Housewright, 900 F.2d 1332 (9th Cir. 1990) (finding no deliberate medical indifference when prison medical staff provided medical care after confiscation of a medical device caused pins in a prisoner's shoulder to break).

**A.    Hepatitis C**

Plaintiff alleges Defendant improperly delayed approving treatment for his hepatitis C. This delay, claims Plaintiff, caused damage to his liver and affected his lifespan. (See FAC at 4.)

To succeed on his Eighth Amendment claim regarding his hepatitis C, Plaintiff must first show that his injury was objectively serious. The objective component of an Eight Amendment insufficient-medical-care claim is generally satisfied so long as the prisoner alleges facts to show that his medical need is "serious" enough that the "failure to treat [that] condition could result in further significant injury or the unnecessary and wanton infliction of pain." Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002) (quotations omitted). This Court finds Plaintiff's hepatitis C infection sufficient to satisfy the objective prong of an Eight Amendment insufficient-medical-care claim.

Upon a thorough review of the record and exhibits filed in support of both parties' motions for summary judgment, the Court finds that Plaintiff fails to meet the second prong of his Eighth Amendment claim as to his hepatitis C virus – that is, Plaintiff fails to show Defendant was deliberately indifferent to his medical needs.  There is no dispute as to any material facts.  Plaintiff was diagnosed with hepatitis C upon entry into the California prison system and was first seen by Defendant in October 2006 whereupon he entered the CDCR Hepatitis C Treatment Clinic Management Program at Centinela State Prison.  This program delineates specific phases in which inmates are to be treated for their hepatitis C virus and applies equally to all prisoners infected with the virus.

As a participant in the program, Plaintiff was required to sign a Hepatitis C Biopsy and Treatment Contract in which he acknowledged that he would need to undergo various laboratory tests prior to and during his treatment, and that completion of the contract did not guarantee that he would be endorsed for treatment.  Inmates may be excluded from the Hepatitis C Program for various reasons, including substance abuse, cirrhosis and cancer.

Since October 2006, Plaintiff was seen by Defendant approximately once (and sometimes twice) per month.  Plaintiff underwent numerous laboratory tests and was examined by various doctors.  Dr. Hamdy, who examined Plaintiff in April 2007, recommended discussion of hepatitis C treatment with Plaintiff regarding the high failure rate and adverse effects in patients with cirrhosis. Defendant, in light of Plaintiff's cirrhosis, low platelet count and CDCR protocol, did not approve treatment for Plaintiff prior to April 2008.  Plaintiff underwent testing again and was regularly informed that, due to his low platelet count and his cirrhosis, he did not qualify under the CDCR protocol for hepatitis C.  In April 2008, Dr. Eskenazi recommended Plaintiff for treatment and Defendant agreed with this recommendation.  Plaintiff began treatment on April 14, 2008.

By Plaintiff's own admission, Defendant denied approving Plaintiff for hepatitis C treatment prior to April 2008 based upon Defendant's monthly monitoring of Plaintiff's health.  In fact, there is nothing in the record to indicate that Defendant was anything but diligent and cautious in treating Plaintiff's hepatitis C.  Although Plaintiff states he was eager to start treatment despite the risks

07cv1604

associated with his cirrhosis and low platelet count, the record shows that he understood and agreed with Defendant's recommendation not to proceed with treatment due to the risks involved. Plaintiff was so aware of the risks involved with his treatment that he filed two appeals for compassionate release.

Further, Plaintiff claims Defendant did not follow the recommendations of Dr. Hamdy or Dr. Eskenazi to provide Plaintiff with the Interferon treatment. The evidence, however, negates this claim. First, it is not clear whether Dr. Hamdy recommended treatment. Dr. Hamdy's medical notes only suggest that he recommended a discussion with Plaintiff regarding treatment options. Second, assuming *arguendo* Dr. Hamdy did suggest treatment, a difference of medical opinion does not constitute a claim of deliberate indifference. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). Third, Defendant's medical notes clearly indicate that Defendant agreed with Dr. Eskenazi's recommendation and Plaintiff was immediately started on Interferon treatment. Thus, Plaintiff's claim is without merit.

Finally, Plaintiff seeks summary judgment on Defendant's treatment delay based on allegations that Defendant (and the entire prison system) takes costs into consideration when making medical decisions. Plaintiff, however, has submitted no evidence in support of his argument that Defendant considered any factors other than his medical expertise, Plaintiff's laboratory test results and CDCR protocol[6]. See Marks v. United States, 578 F.2d 261, 263 (9th Cir.1978) ("Conclusory allegations unsupported by factual data will not create a triable issue of fact").

At best, Plaintiff's claim constitutes a difference of medical opinion between Plaintiff and Defendant. Plaintiff was informed multiple times in his appeals for inadequate medical care at the Centinela state prison that he may not dictate his own treatment plan. Plaintiff is not constitutionally entitled to do so, either. See Franklin v. State of Or., State Welfare Division, 662 F.2d 1337, 1344 (9th Cir. 1981).

Based thereon, this Court respectfully recommends that Plaintiff's motion for summary

---

[6]A review of the CDCR Hepatitis C Clinical Management Program dated March 2004 and provided by Plaintiff makes no mention of cost considerations. (See Doc. 43-4 at 1-18.)

judgment as to this claim be **DENIED** and Defendant's cross-motion for summary judgment be **GRANTED**.

### B.   Knee Injury

Plaintiff alleges Defendant violated his Eighth Amendment right by repeatedly refusing to consent to Dr. Lai's recommendation for knee surgery.  Plaintiff alleges that this refusal led to a "permanent loss of the ability to run and jump and bend due to the knee damges [*sic*] left untreated."  (FAC at 4.)

As noted above, to succeed on his Eighth Amendment claim regarding his knee injury, Plaintiff must first show that his injury was objectively serious.  See Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).  This Court finds Plaintiff satisfies the objective prong of an Eight Amendment insufficient-medical-care claim by showing that his knee injury was serious enough to justify a recommendation for surgery from Dr. Lai.

Plaintiff, however, fails the second showing needed for his Eighth Amendment claim: deliberate indifference.   While it is true that Dr. Lai, a treating outside physician, recommended surgery for Plaintiff, he did so pending approval "from [Plaintiff's] Centinela physician because of his [low platelet count]."  (See Doc. 67-3 at 4.)  Although prison officials who ignore the instructions of a prisoner's treating physician can be found to be deliberately indifferent, see Estelle, 429 U.S. at 105, the facts here do not warrant such a finding.  First, there exists no evidence that Dr. Lai was Plaintiff's treating physician; the evidence merely shows that Dr. Lai examined Plaintiff only once.  Second, assuming Dr. Lai was the treating physician, Defendant here did not ignore Dr. Lai's recommendation for surgery.  Rather, Defendant delayed approving Plaintiff for surgery for some time due to his unique position to monitor Plaintiff's health regularly as his physician at the hepatitis C clinic where he saw Plaintiff once (and sometimes twice) a month.  As Plaintiff admitted during his deposition and even in his FAC, Defendant informed Plaintiff repeatedly that the surgery would cause excessive bleeding and possibly death in light of Plaintiff's low platelet count, a fact acknowledged by Dr. Lai when he qualified his recommendation pending approval from Plaintiff's Centinela physician.

Further, although Defendant did not immediately approve Plaintiff for surgery, Plaintiff did receive treatment. Following his injury, Plaintiff's knee was x-rayed, he received an MRI, was seen by at least four doctors, given a knee brace, and monitored monthly by Defendant to determine whether surgery was a safe option.

Again, Plaintiff's claim constitutes a difference of medical opinion between Plaintiff and Defendant. That, however, does not constitute a cognizable Eighth Amendment claim. See Franklin, 662 F.2d at 1344.

Based on the foregoing, this Court finds that Plaintiff's Eighth Amendment claim fails as to his knee injury and recommends that Plaintiff's motion for summary judgment be **DENIED** as to this ground and Defendant's cross-motion for summary judgment be **GRANTED** as to this ground.

## VI.   CONCLUSION

After thorough review of the record in this case and based on the foregoing, the Court hereby recommends that Plaintiff's motion for summary judgment be **DENIED**, Defendant's cross-motion for summary judgment be **GRANTED**, and this matter **DISMISSED** with prejudice.

//

//

//

//

//

//

//

//

//

//

This report and recommendation will be submitted to the United States District Court judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before **September 4, 2009**. The document should be captioned "Objections to Report and Recommendation."  Any reply to the objections shall be served and filed on or before **September 14, 2009**.  *The parties are advised that no extensions of time will be granted for purposes of filing objections.*  The parties are further advised that failure to file objections within the specified time may waive the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  August 7, 2009

_____
LOUISA S PORTER
United States Magistrate Judge

cc          The Honorable Janis L. Sammartino
            All parties

- 22 -

07cv1604